**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

No. 97-3575

| | | |
|---|---|---|
| Harold W. Mathews, Jr., | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United |
| States | | |
| v. | * | District Court for the |
| Western | | |
| | * | District of Missouri |
| Trilogy Communications, Inc., | * | |
| | * | |
| Defendant-Appellee. | * | |

Submitted:  March 9, 1998
Filed:  May 14, 1998

Before BOWMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
MONTGOMERY, District Judge.[1]

MONTGOMERY, District Judge

Harold J. Mathews, Jr. ("Mathews"), sued Trilogy Communications, Inc. ("Trilogy") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010 et seq., and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140 ("Section 510"), alleging that Trilogy terminated him because he suffers from diabetes and the company did not want to continue paying his diabetes-related health care

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota, sitting by designation.

expenses through its self-insured medical plan.  The district court[2] granted Trilogy's motion for summary judgment on the grounds that Mathews failed to establish a prima facie case of discrimination under the ADA and MHRA, or a prima facie case of retaliation under Section 510 of ERISA.  Mathews appeals from the judgment, and we affirm.

I.

Viewed in the light most favorable to Mathews, the record reveals the following facts.  Mathews is an insulin-dependent diabetic.  He began working for Trilogy as a traveling sales representative in August 1992. During the first three months he worked for the company, Mathews had three diabetic attacks in the presence of other Trilogy employees.  On two of the occasions he lost consciousness  and required hospitalization.  Following Mathews' third attack in October 1992, Trilogy's Human Resources Manager, Doug Kelly, became concerned about Mathews' diabetic condition and the possibility of an a diabetic episode while with a client.  Thus, Kelly met with Mathews to determine what, if anything, Trilogy could do to help him better control his condition.  At the meeting, Mathews insisted that his condition was not a problem and that he would have no further diabetic episodes as  he could sense when they were coming on and take the necessary preventative measures.  Although he has difficulty recalling the specifics of what Kelly said, Mathews claims to have left the meeting with the distinct impression that Trilogy would be watching him and "that the company would view [another diabetic episode] as a possibility for dismissal."

Mathews continued in his employment without another diabetic attack for almost two years and received favorable performance reviews from Trilogy in both August 1993 and August 1994.  In September 1994, Mathews' supervisor, Neil Brasfield, attended a meeting in Kansas City, Missouri with Mathews and a prospective client.

---

[2]The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

Mathews' unusual behavior while the two were together--high strung and easily excited one evening then very subdued to the point of not paying attention the next morning--led Brasfield to question whether Mathews was properly monitoring his medication. Brasfield memorialized his observations in a memo to Kelly, who in turn consulted with Mathews' physician, Dr. Mark Schroeder. Dr. Schroeder indicated that Mathews was taking his medication as directed and there was no reason for concern over his health. Given Dr. Schroeder's assurances, Kelly took no further action. Neither Kelly nor Brasfield were aware of any other diabetic episodes Mathews experienced prior to his termination in August 1995.

In February 1995, Trilogy entered into a contract with a new insurance carrier, Chandler Sampson Insurance, Inc. ("Chandler Sampson"). Shortly thereafter, Chandler Sampson requested driving records of the employees covered by the new policy. Mathews' record revealed that he had been ticketed for speeding on June 30, 1993, and March 18, 1994, and that his driver's license had been suspended for driving under the influence of alcohol on June 22, 1993. The record also showed that Mathews' license had not been reinstated until June 15, 1994. Based on its review of the employees' records, Chandler Sampson notified Trilogy that Mathews and three other employees had problem driving records. In July 1995, Chandler Sampson informed Trilogy that it planned to monitor Mathews and another employee, and that they would be excluded from coverage for any additional driving violations.

Meanwhile, Mathews suffered another diabetic incident at his home on June 6, 1995. Mathews passed out, broke his leg in the fall, and was hospitalized for six days. The medical bills related to this incident were $15,000. Trilogy maintains a self-insured health plan for its employees; therefore, less a $100 deductible, Trilogy paid Mathews' medical bills in their entirety. Mathews did not tell anyone at the company that the incident was related to his diabetic condition. Instead, Mathews told Brasfield that he had tripped over some clutter in his house. There is no evidence in the record that anyone at Trilogy knew Mathews' broken leg was the result of a diabetic attack.

On August 14, 1995, Chandler Sampson checked Mathews' driving record again and discovered that he had received another speeding violation on April 13, 1995.  Thus, the insurance company excluded Mathews from further coverage under Trilogy's policy.  On August 15, 1995, Brasfield contacted Mathews by phone to inform him that he was no longer covered by the company's insurance carrier and that he was not to drive the company vehicle or his personal vehicle on company business until other arrangements for insurance coverage could be made.  Brasfield also told Mathews that if he could verify the amount of his personal insurance coverage, Trilogy might consider using Mathews' personal insurance policy assuming it met all the legal requirements.  Mathews failed to offer any proof of personal insurance, and it was later decided that having an employee use his or her personal insurance would be both unworkable and not in the company's best interest.

On August 17, 1995, Brasfield sent a memo to Mathews outlining a possible discrepancy on his motor vehicle record regarding his driving privileges.  According to the record, Brasfield noted that Mathews had received an administrative  suspension for driving under the influence of alcohol on June 22, 1993.  Although the record reflected that the end date of the suspension was September 20, 1993, Mathews' license was not reinstated until June 15, 1994.  Brasfield requested that Mathews compare this information with his own records and provide management with some documentation if the information was incorrect.  Mathews denied incurring the violations but he was unable to provide management with evidence that the motor vehicle record was inaccurate.[3]

---

[3]Although there is conflicting evidence in the record concerning the length of time Mathews was without driving privileges while employed by Trilogy, the evidence conclusively shows that he was without valid driving privileges at least from May 15, 1994, to June 15, 1994.  See Aff. of Anne McEowen, Supervisor of the Administrative Alcohol Section for the Missouri Department of Revenue (Appellant's App. at 111); Letter from Richard A. James, Esq., to Doug Kelly, August 24, 1995(Appellant's App. at 279).

On August 18, 1995, Jim Wonn, Trilogy's Vice President of Domestic Operations, notified Kelly that after reviewing Mathews' driving records he had concluded that Mathews had demonstrated a pattern of unsafe driving; had given management false explanations for his various violations;[4] had put Trilogy at risk because he was uninsurable; and had operated a company car without a proper driver's license. Accordingly, Wonn directed Kelly to terminate Mathews immediately. Kelly and Brasfield notified Mathews of his termination by telephone that same afternoon.

## II.

We review the district court's entry of summary judgment de novo. Price v. S-B Power Tool, 75 F.3d 362, 364 (8th Cir.), cert. denied, 117 S.Ct. 274, 136 L.Ed.2d 197 (1996). Summary judgment is proper when the record reveals "no genuine issue as to any material fact ... and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When evaluating a motion for summary judgment, we must draw all reasonable inferences in favor of the non-moving party and refrain from assessing credibility. Miller v. Nat'l Cas. Co., 61 F.3d 627, 628 (8th Cir. 1995). The non-moving party, however, may not simply rest upon the pleadings, but must point to evidence in the record sufficient to raise a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The ADA prohibits employment discrimination against a qualified individual because of a disability. See 42 U.S.C. § 12112(a). To make out a prima facie case of disability discrimination under the ADA, Mathews needed to establish the following: 1) he was a disabled person within the meaning of the ADA; 2) he was qualified to

---

[4]When Mathews was arrested in 1993 for driving under the influence of alcohol he spent six days in jail on another matter involving unpaid child support. Mathews told his supervisor that he was in jail for failure to pay child support but did not mention his citation for driving under the influence.

perform the essential functions of the job, with or without reasonable accommodation; and 3) he suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises. Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1318 (8th Cir. 1996); Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995).[5] The district court granted Trilogy summary judgment based on Mathews' failure to establish the second element. The court concluded that because Mathews was uninsurable under the company's automobile insurance policy for reasons unrelated to his diabetes, he was not qualified to perform one of the essential functions of a traveling salesperson-- driving to the locations of clients.

Mathews argues that the district court's analysis "short-circuited" the burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 1824-26, 36 L.Ed.2d 668 (1973), and its progeny, by considering one of Trilogy's proffered reasons for discharging him when evaluating whether he had presented a prima facie case. Under the McDonnell Douglas test, once a plaintiff has set forth a prima facie case of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. 411 U.S. at 802, 93 S. Ct. at 1824, 36 L.Ed.2d 668. If the employer does so, the burden of production shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for unlawful discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-508, 113 S. Ct. 2742, 2747-48, 125 L.Ed.2d 407 (1993). Mathews contends that the district court should have given him the opportunity to demonstrate to a jury that Trilogy's inability to secure coverage for him under its automobile insurance policy did not disqualify him from performing an essential function of his job, but rather was a pretext for the company to terminate him because of his diabetes.

---

[5]Mathews' claims under the ADA and the MHRA are governed by the same standards. See Tart v. Hill Began Lumber Co., 31 F.3d 668, 671 (8th Cir. 1994) (federal employment discrimination decisions apply to MHRA).

Mathews relies primarily on two cases: <u>Miners v. Cargill Communications., Inc.</u>, 113 F.3d 820 (8th Cir. 1997) and <u>MacDonald v. Eastern Wyoming Mental Health Ctr.</u>, 941 F.2d 1115 (10th Cir. 1997).  In <u>Miners</u>, the plaintiff brought an ADA claim against her employer after she was terminated for driving a company vehicle under the influence of alcohol and refusing to attend a chemical dependency treatment program.  <u>Id.</u> at 822. The employer argued that the plaintiff could not establish, as part of her prima facie case, that she was "otherwise qualified" to perform her job because driving a company vehicle under the influence of alcohol violated the employer's written rules and was contrary to the employer's interests. <u>Id.</u> at 823 n.6.  The Court rejected the argument, noting that to accept it "would allow an employer's proffered reason for an unfavorable action toward an employee, pretextual or not, to prevent a plaintiff from presenting a prima facie case in all but the most blatantly discriminatory cases under the ADA."  <u>Id.</u>

In <u>MacDonald</u>, the plaintiffs filed suit against their former employer alleging that they had been discharged in violation of the Age Discrimination in Employment Act.  941 F.2d at 1117.  The court ruled in favor of the employer, finding that the plaintiffs offered no evidence that the employer's actions were a pretext for age discrimination.  <u>Id.</u> at 1122. In arriving at this conclusion, however, the court held that the employer's articulated reasons for discharging the plaintiffs could not be used to defeat their prima facie case, but could only be considered at the pretext stage of the analysis.  <u>Id.</u> at 1119-1121.  The court then found that the plaintiffs were qualified as they had established that they possessed "the objective professional qualifications they held when they were hired."  <u>Id.</u> at 121.

Whether considered at the prima facie stage or the pretext stage of the analysis, the fact that Mathews' was no longer insurable under the company's insurance plan entitled Trilogy to summary judgment.  Unlike the plaintiffs in <u>Miners</u> and <u>MacDonald</u>, at the time Mathews was terminated he no longer possessed the same objective professional qualifications as when he was hired.  <u>See</u> <u>Bienkowski v. American</u>

<u>Airlines, Inc.</u>, 851 F.2d 1503 (5th Cir. 1988) (Plaintiff's qualifications placed in issue where he has suffered "loss of a professional license or some other occurrence rendering the plaintiff unfit for the position for which he was hired."). When Trilogy hired Mathews he possessed a valid driver's license and was an insurable driver under the company's insurance policy. Because Trilogy's sales personnel must be able to drive to the locations of various clients, possessing a valid driver's license and being insurable under the company's insurance policy are not merely company rules, but rather objective professional qualifications for the job. Chandler Sampson decided that Mathews' was no longer an insurable driver due to his poor driving record while working for Trilogy. Thus, independent of any subjective decision made by Trilogy, Mathews could not establish that he was objectively qualified to perform the essential functions of his job at the time he was terminated.[6] Accordingly, Mathews failed to establish a prima facie case of disability discrimination.

Even assuming, however, that Mathews successfully established a prima facie case, he has not presented sufficient evidence from which a jury could conclude that Trilogy terminated him because of his diabetes. Trilogy offers two legitimate, non-discriminatory reasons for its decision to terminate Mathews: 1) he was excluded from Trilogy's automobile insurance policy because of his unsafe driving record while working for the company; and 2) he operated a company vehicle without a valid driver's license in violation of company policy. As noted above, after an employer offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to Mathews to prove that the proffered reason was merely a pretext for discrimination. <u>Christopher v. Adam's Mark Hotels</u>, 137 F.3d 1069, 1072 (8th Cir. 1988). Mathews must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient

---

[6]Mathews claims that Trilogy could have obtained insurance coverage for him from another automobile insurer or that he could have used his own personal automobile insurance. There is no evidence in the record, however, to support either claim.

evidence for a reasonable trier of fact to infer discrimination. <u>Rothmeier</u> <u>v. Inv. Advisers</u>, 85 F.3d 1328, 1335 (8th Cir. 1996).

To show pretext, Mathews initially points to Trilogy's adoption of an automobile usage policy just days prior to his termination. He argues that the policy was specifically drafted to justify his termination and that Trilogy did not retroactively discipline any other employees under the policy. The evidence shows, however, that Kelly began drafting the policy in June 1995, almost three months before he or Brasfield were informed that Mathews had a problem driving record and was therefore being denied insurance coverage. The fact that Mathews was the only employee disciplined under the policy is of little significance. Plaintiff does not present evidence that any of Trilogy's other employees were denied insurance coverage or drove a company vehicle without a valid driver's license.

Next, Mathews contends that Kelly made direct expressions of discriminatory bias concerning his diabetic condition. As evidence of such bias, Mathews initially points to the meeting with Kelly shortly after his diabetic attacks in 1992. Mathews admits, however, that he does not remember the specifics of the conversation. Mathews Dep. at 216. Rather, he can only recall that he left the meeting with the impression that if he had another diabetic incident it would jeopardize his job. Mathews Dep. at 219. There is no linkage between any purported discriminatory animus Kelly expressed during that meeting and Mathews' termination three years later. At the time of Mathews' termination, Kelly was unaware that Mathews' had suffered another diabetic attack in his home three months earlier. Furthermore, Mathews was successfully employed by Trilogy for three years following this meeting with Kelly and he received favorable work evaluations in the interim. Such vague and remote evidence of discriminatory bias is insufficient to link Mathews' termination with his diabetic condition.

Mathews also claims that Kelly's discriminatory bias is evidenced by his referral

to Mathews as a "diabetic poster boy."  The reference was made during Kelly's deposition after litigation had commenced and was intended to describe the manner in which Mathews viewed his own condition--not the manner in which Kelly viewed Mathews' condition.  <u>See</u> Kelly Dep. at 69. Statements by decisionmakers that are unrelated to the decision process itself do not constitute direct evidence of discriminatory bias.  <u>Beshears v. Asbill</u>, 930 F.2d 1348, 1354 (8th Cir. 1991).  Mathews' impressions of a meeting held three years before his termination and an ambiguous comment made in a deposition two years after his termination are insufficient to raise an inference of discriminatory bias.

Similarly, Mathews' final two attempts to show pretext are wholly unpersuasive.  Mathews claims that Trilogy gave particular scrutiny to his driving record after he suffered his diabetic attack in June 1995.  There is no evidence, however, that anyone at Trilogy was aware that Mathews' broken leg was the result of a diabetic incident until long after he was terminated.  Furthermore, it was Chandler Sampson, not Trilogy who scrutinized Mathews' driving record.  Neither Kelly nor Brasfield was informed of Mathews' poor driving record until August  1995, over two months after Mathews' diabetic attack.  At that point, they attempted to verify the accuracy of the records before deciding to terminate Mathews' employment.

Finally, Mathews contends that Trilogy created post-hoc justifications for his termination, giving rise to an inference that the justifications were merely a pretext for discrimination.  It is clear from the record, however, that Trilogy has consistently asserted as reasons for Mathews' termination the inability to obtain insurance coverage for him and his operation of a company vehicle without a valid driver's license.  Mathews' has failed to present sufficient evidence for a jury to conclude that his termination was based on anything other than Trilogy's legitimate, non-discriminatory justifications; therefore, the district court properly dismissed his ADA and MHRA claims.

III.

Mathews also appeals from the district court's summary judgment of his retaliation claim under Section 510 of ERISA. Under Section 510, an employer may not discharge an employee "for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. The same burden-shifting framework that applied to Mathews' ADA claim also applies to his claim under Section 510. Rath v. Selection Research, Inc., 978 F.2d 1087, 1089 (8th Cir.1992).

To establish a prima facie case of retaliation, Mathews needed to establish a causal connection between his participation in Trilogy's self-insured medical plan and his termination. Kinkead v. Southwestern Bell Tel. Co., 49 F.3d 454, 456 (8th Cir. 1995). The connection may be established either through direct evidence of retaliation or circumstantial evidence "such as proof that the discharge followed an exercise of protected rights so closely in time as to justify an inference of retaliatory motive." Rath, 978 F.2d at 1090. Mathews' only evidence of causal connection is his termination two months after submitting a $15,000 claim under Trilogy's self-insured medical plan. Mathews claims that he was terminated because of the substantial amount of the claim and because his medical condition would result in large medical bills in the future.

While a time lapse of only two months between the exercise of protected rights and a discharge may create the inference of a retaliatory motive, we agree with the district court that under the circumstances of this case, no such inference arises. The record reveals that Mathews had claimed substantial benefits for hospitalizations resulting from two diabetic attacks in 1992 and suffered no adverse employment action at that time. Significantly, Trilogy did not learn that Mathews' June 1995 hospitalization was the result of a diabetic attack until after Mathews was terminated in August 1995. Consequently, when Trilogy made the decision to terminate Mathews

it had no reason to believe that Mathews would incur substantial diabetes-related medical expenses in the future. Furthermore, five other Trilogy employees had submitted claims against its health insurance plan in excess of Mathews' claims yet remained employed by the company. Finally, as explained above in section II, Trilogy has set forth two legitimate, non-discriminatory reasons which account for the timing of Mathews' termination. We affirm the district court's decision to dismiss Mathews' ERISA claim.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT